**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Paul J. Anderson and Sally C. Anderson, | ) | Case No. 6:17-bk-01434-RAC |
| | ) | |
| Debtors. | ) | |
| | ) | |
| Garry P. Lodoen, individually and derivatively on behalf of IDKB Holding, LLC, IDKB Marketing, LLC, and IDKB Research, LLC, and Darla K. Lodoen, | ) ) ) ) | Adversary Proceeding No. _____ |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Paul J. Anderson and Sally Anderson, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**COMPLAINT FOR NONDISCHARGEABILITY OF DEBT PURSUANT TO 11 U.S.C.**
**§§ 523(A)(2), (A)(4), (A)(6)**

Plaintiffs Garry P. Lodoen ("Mr. Lodoen") and Darla K. Lodoen ("Mrs. Lodoen") (collectively, "the Lodoens"), IDKB Holding, LLC, IDKB Marketing, LLC, and IDKB Research, LLC, file their Nondischargeability Complaint against Paul J. Anderson ("Mr. Anderson") and Sally C. Anderson ("Mrs. Anderson") (collectively, "the Andersons"), and in support, state and allege as follows:

**INTRODUCTION**

This case is a classic swindle, in which the Andersons leveraged the Lodoens' charitable nature against them in order to willfully and maliciously steal the Lodoens' money for their own personal use and enjoyment.

Like many Minnesotans, the Lodoens are passionate about Minnesota Vikings football. But, also being philanthropists, the Lodoens wanted to transform their Vikings fan club into a charitable organization to help the less fortunate.  Mr. Anderson, another member of the fan club, was looking for seed money to fund his latest startup.  As part of a well-calculated misdirection, the Andersons convinced the Lodoens that if they funded the development of a mobile phone application ("App") that Mr. Anderson wanted to develop, they could use the App to generate money for their contemplated charity.  Ultimately, the Andersons convinced the Lodoens to provide hundreds of thousands of dollars in startup funding for the App's development—all under a fraudulent promise that these funds would be used for the benefit of the contemplated charity and a company owned by Mr. Lodoen and Mr. Anderson.

The Andersons' business proposal was nothing more than a scam.  They never intended to let the charity, the Lodoens, or anyone else make money off of the App.  It was always the Andersons' plan to (1) use the parties' contemplated business venture as a vehicle for Mr. Anderson to pay himself a handsome salary which he would not report to the IRS, and (2) let the Lodoens fund the App's development expenses, and then abscond with the company's assets and finished product—which is exactly what they did.  Over the course of two years, Mr. Anderson spent all of the Lodoens' money (often, to fund his own lavish lifestyle), without ever providing a penny of return to them or the charity.  Once the money was gone, Mr. Anderson looted the App and all of its supporting equipment, transferring them to either himself or a separate company owned by Mr. Anderson for less than fair market value and, for good measure, cleaned out the charity's bank accounts.  Mr. Anderson now markets the App through his new company, in which the Lodoens hold no interest, keeping all the profit for himself.

On September 13, 2016, the Lodoens commenced a civil action in Minnesota District Court, Court File No. 27-CV-16-13693 (the "Minnesota Action"), to recover the money wrongfully stolen by the Andersons. The Andersons subsequently instituted a Chapter 7 bankruptcy case in an effort to avoid liability for their willful, malicious, and fraudulent conduct. The Lodoens bring the current adversary proceeding to prevent the Andersons from misusing the United States Bankruptcy Code to obtain absolution for their fraudulent scheme.

## PARTIES, JURISDICTION, AND VENUE

1.      Mr. Lodoen is an individual residing at 9469 Olympia Drive, Eden Prairie, Minnesota 55344.

2.      Mrs. Lodoen is an individual residing at 9469 Olympia Drive, Eden Prairie, Minnesota 55344.

3.      Mr. Anderson is an individual residing at 305 Milano Lane, Apartment #112, Melbourne, Florida 32940.

4.      Mrs. Anderson is an individual residing at 305 Milano Lane, Apartment #112, Melbourne, Florida 32940.

5.      IDKB Holding, LLC ("IDKB Holding") is a Florida limited liability company with its principal place of business located at 305 Milano Lane, Apartment #112, Melbourne, Florida 32940.

6.      IDKB Holding's members are domiciled in Minnesota and Florida.

7.      IDKB Marketing, LLC ("IDKB Marketing") is a Florida limited liability company with its principal place of business located at 305 Milano Lane, Apartment #112, Melbourne, Florida 32940.

8.      IDKB Marketing's members are domiciled in Minnesota and Florida.

9.      IDKB Research, LLC ("IDKB Research") is a Florida limited liability company with its principal place of business located at 305 Milano Lane, Apartment #112, Melbourne, Florida 32940.

10.      IDKB Research's members are domiciled in Minnesota and Florida.

11.      IDKB, Inc. is a Florida corporation with its principal place of business located at 305 Milano Lane, Apartment #112, Melbourne, Florida 32940.

12.      Mr. Anderson is IDKB, Inc.'s sole owner.

13.      This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I) because this action arises under title 11 and is a core proceeding regarding the determination as to the dischargeability of particular debts of the Andersons in their Chapter 7 case, Case No. 6:17-bk-01434-RAC.

14.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409 because this adversary proceeding arises under title 11 and is related to the aforementioned case instituted by the Andersons under title 11 that is currently pending in this Court.

## FACTUAL ALLEGATIONS

I.      **Mr. Anderson Meets Mr. Lodoen and Proposes Mr. Lodoen Fund a Startup Company.**

15.      Mr. Lodoen is a 70 year-old, decorated, 100% disabled Vietnam war veteran and former owner of a successful construction business.  The Lodoens are passionate about Minnesota Vikings football.

16.      Mr. Anderson is an entrepreneur and MIT graduate trained in computer science. Mr. Anderson and Mrs. Anderson are husband and wife.

17.      Beginning in late 2013, the Lodoens and the Andersons met and became friends through an informal Minnesota Vikings fan club known as the Viking World Order ("VWO").

18.     The Lodoens desired to transform the VWO from a fan club into a charitable organization to help the less fortunate, and discussed their vision to do so with Mr. Anderson.

19.     Mr. Anderson encouraged the Lodoens to pursue this endeavor, and assisted in getting "VWO Charity" registered as a Minnesota nonprofit corporation on June 25, 2014.

20.     At Mr. Anderson's request, Mr. Lodoen opened a bank account in VWO Charity's name.  Mr. Lodoen did so, giving signing authority to himself, Mrs. Lodoen, and Mr. and Mrs. Anderson.  The Lodoens provided initial funding for VWO Charity's bank account.

21.     Due to difficulties with certain segments of the VWO membership, the Lodoens and the Andersons subsequently abandoned VWO Charity and incorporated Viking Family Charity, Inc. ("VFC"), a Minnesota nonprofit corporation, to fulfill VWO Charity's philanthropic purposes.  Some members of the VWO, however, wished to participate in VFC's charitable endeavors, and participated in VFC's activities.

22.     At Mr. Anderson's request, Mr. Lodoen opened a bank account in VFC's name.  Mr. Lodoen did so, giving signing authority to himself, Mrs. Lodoen, and Mr. and Mrs. Anderson.

23.     The Lodoens provided initial funding for VFC's bank account.

24.     The Lodoens and the Andersons agreed that they would all own VFC.  However, when Paul Anderson incorporated VFC, his listed only himself and Sally Anderson as "incorporators," merely listing Mr. Lodoen as VFC's registered agent, and omitting Darla Lodoen entirely.

25.     Mr. Anderson presented the Lodoens with a fraudulent business plan to provide funding for VWO Charity (and later, VFC).  Specifically, Mr. Anderson proposed that he and Mr. Lodoen start a for-profit business venture to create a mobile phone application designed to

provide sports fans with live, game-related video content. Mr. Anderson claimed that the App would generate money through various methods, such as premium membership fees for users, paid advertisements, and mining and selling user data to third-party advertisers.

26.     Mr. Anderson also proposed other markets for the App, including uses in other professional sports settings, as well as non-sports settings, such as in the music sector.

27.     Mr. Anderson proposed that VFC would pay the proposed for-profit entity in exchange for limited rights to use the App, which VFC could in turn use to generate revenue for itself and solicit donations from the App's users.

28.     Mr. Anderson further proposed that the Lodoens provide funding for this business venture, while Mr. Anderson would oversee the company.

29.     In the summer of 2014, Mrs. Anderson joined in several telephone conversations with Mr. Anderson and the Lodoens in which she assured the Lodoens that, if they provided funding to develop and market the App, Mr. Anderson would treat the Lodoens as business partners and that Mr. Anderson would attempt to operate the proposed company in good faith, using his best efforts to generate a profit.

30.     Unbeknownst to the Lodoens, however, the Andersons merely wished to use the proposed business venture as a mechanism to defraud the Internal Revenue Service ("IRS"), to which the Andersons are heavily indebted, to absorb all of the App's significant startup expenses before they absconded with the App, and to convert IDKB Marketing, IDKB Research, and IDKB Holdings' (collectively, the "IDKB Companies") tangible and intangible assets for their own personal use.

31.     The Andersons never intended to stay in business with the Lodoens, and never planned for the proposed for-profit company to earn any actual profit. From the beginning, it

was the Andersons' plan to extract as much funding from the Lodoens as possible, and use that funding for three purposes.

32.     First, the Andersons sought to use the Lodoens' funding to secretly pay Mr. Anderson a handsome, six-figure salary which they could shield from IRS scrutiny.  This would allow Mr. Anderson to earn a salary without paying taxes on it, and avoid paying the back taxes he owed to the IRS.

33.     Second, the Andersons sought to use the Lodoens' funding to support all of the App's significant startup costs.  To this end, the Andersons sought to use the Lodoens' funding to acquire necessary assets, both tangible and intangible, to develop and market the App, and— once the App was positioned to earn a profit—abscond with those assets into an affiliated entity owned by Mr. Anderson in which the Lodoens had no interest.

34.     Third, the Andersons used the Lodoens' funding to obtain high-end audiovisual and computer equipment, ostensibly needed to support the App, which they intended from the beginning to convert for their own personal use.

35.     The Andersons listed a $46,000 unsecured debt to the IRS in their bankruptcy petition, which Mr. Anderson incurred in 2010 and 2012, which Mr. Anderson now seeks to have discharged by this Court.

36.     Mr. Anderson testified at the meeting of the creditors that he "believe[d]" that this debt to the IRS arose due to his failure to pay personal income taxes in the years 2010 and 2012. Mr. Anderson, however, claimed that he could not be sure how this debt arose "without looking at the records."

37.     Nonetheless, Mr. Anderson represented to this Court in his bankruptcy petition that this debt to the IRS arose out of "1040 taxes for 12/31/10 and 12/31/12," indicating that Mr. Anderson failed to pay the IRS personal income taxes that he owes to the government.

38.     Because Mr. Anderson was to be the IDKB Companies' only employee, Mr. Anderson was in a position to both pay himself a salary, as well control whether or not the IDKB Companies would report his salary to the IRS.

39.     Mr. Anderson never reported any of his salary from the IDKB Companies to the IRS.  Regarding this income, Mr. Anderson testified at the meeting of the creditors, *inter alia*, that "nothing has been reported to the IRS is my testimony."

40.     Mr. Anderson explained that his accountant told him that if he denominated his salary from the IDKB Companies as "stipends," then he was not required to report this income to the IRS.  Mr. Anderson testified, *inter alia*, that his accountant "was the one that said this is the way we should set it up."

41.     Subsequent to providing this testimony at the meeting of the creditors, Mr. Anderson amended his bankruptcy petition to add a claim against his accountant for "possible accounting malpractice" as an asset of the bankruptcy estate.

42.     Mr. Anderson testified at the meeting of the creditors that he currently has "somewhere between twenty-five to fifty thousand dollars" worth of audiovisual equipment, purchased with the Lodoens' money, in his home.

43.     Mr. Anderson has prior felony convictions for, *inter alia*, obtaining high-end audiovisual and stereo equipment through fraud, wherein Mr. Anderson knowingly issued a bad check to pay for said equipment, and thereafter changed addresses so that neither the bank

against which the check was drafted nor the equipment supplier could locate him (Cache County Utah Court File No: 84-CR-362).

44.    Mr. Anderson also has prior felony convictions for, *inter alia*, welfare fraud by failing to inform the Utah state Division of Family Services that he had put his children into foster care while continuing to receive and cash checks provided to him by the state of Utah for the purpose of providing for these children (Cache County Utah Court File No: 83-CR-182).

## II.    Mr. Anderson Forms Businesses To Develop the App, and Uses the Lodoens' Money To Acquire Assets, Fund Startup Costs, Entertain Himself, and Pay Himself a Handsome Salary.

45.    On July 10, 2014, Mr. Anderson began communicating with a Florida law firm, Zies Widerman Malek ("ZWM") to help set up three companies (IDKB Holding, IDKB Research, and IDKB Marketing) to support development of the App, and to apply for patent protection for the App.

46.    Shortly thereafter, the Lodoens personally paid ZWM a $5,000 retainer as advance payment for ZWM's services.

47.    Although the Lodoens advanced these funds to pay for certain services on behalf of the IDKB Companies, the Lodoens never gifted, invested, lent, or otherwise transferred these funds to the IDKB Companies.

48.    On July 25, 2014, ZWM filed the appropriate paperwork with the Florida Department of State to create IDKB Holding, IDKB Research, and IDKB Marketing as Florida limited liability companies.  Mr. Lodoen and Mr. Anderson were the only two members of these entities.

49.    IDKB Holding acted as a holding company for IDKB Research and IDKB Marketing.

50.    IDKB Research's only business function was to hold the intellectual property rights for the App, and make those rights available to IDKB Marketing.

51.    IDKB Marketing was the operational arm of the three companies.  It held much of the IDKB Companies' assets and engaged in all of the day-to-day development and marketing of the App.

52.    The following chart represents the organizational structure of the IDKB Companies:



53.    Beginning in October 2014, and continuing over the course of the next twelve months, the Lodoens provided $100,000 in startup funding for the IDKB Companies.

54.    In November 2014, Mr. Anderson began making significant outlays for equipment, including high-end audiovisual equipment, sophisticated computer programs to support the App's development, and computer equipment.  Mr. Anderson also purchased support services, such as hiring coders to program the App.

55.    Mr. Anderson spent tens of thousands of dollars on food, alcohol, travel, entertainment, and related expenses that IDKB Marketing paid or reimbursed.  Mr. Anderson claimed that these expenses were for marketing purposes.  On information and belief, Mr.

Anderson expended these funds for the purpose of marketing the App with the intent to abscond with it once it became viable, while using the Lodoens' money to entertain himself in the process.

56.    Mr. Anderson also began advancing $4,000 per month to a music band he managed, based on a promissory note executed by the band in IDKB Marketing's favor.

57.    Mr. Anderson explained that, although the band had no assets, it would earn compensation from IDKB Marketing in exchange for engaging in musical performances to be broadcast through the App, which the App's users would pay to view.  Mr. Anderson claimed that the band would subsequently be able to repay the promissory note.

58.    Mr. Anderson made these advances to the band in bad faith in order to test—at the Lodoens' expense—the App's viability in the music sector.

59.    Mr. Anderson knew at the time he made these advances that IDKB Marketing would never be reimbursed, or derive any other benefit from its loans to the band.  Mr. Anderson knew that the App would either not be viable in the music sector (in which case the band would be unable to repay its note), or if the App was viable in the music sector, that Mr. Anderson would abscond with the IDKB Companies' assets and company opportunities, leaving the band without any ability to earn any commissions from the App.  Either way, Mr. Anderson knew that the band would never have the ability to repay its promissory note to IDKB Marketing.

60.    IDKB Marketing's bank statements showed that Mr. Anderson wrongfully withdrew tens of thousands of dollars in cash, for which there was no explanation.

**III.    The Andersons Induce the Lodoens To Invest Additional Money into IDKB Marketing, Unilaterally Wind Up the Companies, and Sell Their Assets to an Affiliated Entity Through Which They Currently Market the App.**

61.    By the fall of 2015, IDKB Marketing was out of money.  In over a year of operations, IDKB Marketing had generated no income whatsoever, yet Mr. Anderson had spent $95,000 out of the $100,000 in startup funds provided by the Lodoens.

62.    Mr. Anderson never filed any tax returns for any of the IDKB entities.

63.    Due to cash shortfalls, Mr. Anderson opened two credit card accounts and a business line of credit through Wells Fargo, in IDKB Marketing's name (collectively, the "Credit Accounts").  Mr. Anderson claimed that he was able to secure the Credit Accounts by pledging his personal assets, and those of his company, IDKB, Inc., as security.

64.    Mr. Anderson requested that Wells Fargo raise the credit limits on the Credit Accounts to $25,000.  In connection with this request, Wells Fargo asked Mr. Lodoen to pledge his personal assets as collateral on the debt associated with the Credit Accounts.

65.    Wells Fargo is aware of the Andersons' bankruptcy filing, and now seeks to recover the entire amount owing on the Credit Accounts from Mr. Lodoen personally.

66.    In November 2015, in furtherance of his scam, Mr. Anderson informed the Lodoens that IDKB Marketing would fail if they did not contribute an additional $100,000.

67.    To induce the Lodoens to make this contribution, Mr. Anderson falsely represented to the Lodoens that if they supplied additional funding to IDKB Marketing, Mr. Anderson would attempt to operate the IDKB Companies in good faith, using his best efforts to generate a profit for the IDKB Companies.  Mr. Anderson made these representations to the Lodoens from October 2015 to January 2016.

68.    During this time period, Mrs. Anderson joined the Lodoens and Mr. Anderson on several phone calls in which she corroborated Mr. Anderson's claims that the IDKB Companies

were in a financial crisis, and assured the Lodoens that if they supplied additional funding to IDKB Marketing, Mr. Anderson would attempt to operate the IDKB Companies in good faith, using his best efforts to generate a profit for the IDKB Companies.

69.     The Andersons knew at the time they made these statements that they were false. Mr. Anderson planned to abscond with the IDKB Companies' assets after IDKB Marketing received, and spent, the Lodoens' additional funding.

70.     Moreover, Mr. Anderson never intended for the IDKB Companies to make a profit.  Rather, he intended to use the IDKB Companies as a vehicle to earn a salary that Mr. Anderson would not report to the IRS, thereby avoiding paying taxes and his past due obligations to the IRS.

71.     Mr. Anderson always intended to defraud the Lodoens into continuing to supply money to the IDKB Companies for this purpose for as long as he could, knowing from the beginning that as soon as the Lodoens' willingness to fund the IDKB Companies ran out, he would simply walk away from the parties' joint business venture, and abscond with its assets in the process.

72.     As a further fraudulent inducement to the Lodoens, Mr. Anderson also told them that he would execute a promissory note, in his personal capacity, guaranteeing the funds that he requested the Lodoens lend to IDKB Marketing.

73.     Mr. Anderson knew at the time he made this statement that it was false.  Mr. Anderson never intended to execute a promissory note in his personal capacity in favor of the Lodoens.  Rather, Mr. Anderson planned to execute a promissory note at a later date, on behalf of IDKB Marketing, in favor of the Lodoens.

74.     Mr. Anderson knew at the time he made this misrepresentation that, consistent with his plan to abscond with the IDKB entities' assets, IDKB Marketing would never have any money to repay the contemplated promissory note.

75.     Based on the Andersons' intentional misrepresentations, between November 1 and January 16, the Lodoens advanced $28,000 to IDKB Marketing.

76.     Once the Lodoens began advancing these funds to IDKB Marketing, Mr. Anderson began paying himself a monthly "stipend" of $13,000, and another $3,000 per month to cover certain claimed business expenses.

77.     On January 16, 2016, Mr. Anderson delivered an executed promissory note (the "Note") obligating IDKB Marketing to repay the additional funds the Lodoens had advanced to IDKB Marketing, and future contemplated advances, totaling $100,000.   The Note was backdated to November 1, 2015.  Mr. Anderson did not execute the Note in his personal capacity as he had promised the Lodoens.

78.     Mr. Anderson knew at the time he executed the Note that, consistent with his plan to abscond with the IDKB entities' assets, IDKB Marketing would never have any money to repay the Note.

79.     At this time, Mr. Anderson also began falsely asserting that he had personally raised and/or contributed hundreds of thousands of dollars to IDKB Marketing, and that these contributions equaled the Lodoens' financial contributions.

80.     Despite repeated requests, Mr. Anderson never provided a shred of evidence supporting these claims, and none of this purported money ever reached IDKB Marketing's bank account.  Mr. Anderson's representations were false.

81.     In reliance on the Andersons' fraudulent misrepresentations, over the next several months the Lodoens advanced an additional $70,000 to IDKB Marketing.

82.     Mr. Anderson continued to draw $13,000 per month in salary and expenses and acquired tangible and intangible property to support the development and marketing of the App.

83.     On February 1, 2016, the Andersons claimed that the Lodoens were funding the loan too slowly, and that if they did not accelerate their cash advances, IDKB Marketing would fail.

84.     In reliance on the Andersons' representations, the Lodoens thereafter furnished the rest of the funds contemplated in the Note.

85.     On or about June 7, 2016, shortly after the Lodoens had fully funded the Note, Mr. Anderson stated that he had found additional investors for the App, and was in the process of negotiating a salaried position for himself with the investors' company.

86.     On June 27, 2016, Mr. Anderson withdrew all money from the VWO Charity and VFC bank accounts, and removed Mr. and Mrs. Lodoen's signing authority on these accounts. On information and belief, Mr. Anderson fraudulently converted these funds for his own purposes.

87.     In an undated letter, postmarked July 21, 2016, Mr. Anderson stated that IDKB Marketing was out of money, and that Mr. Anderson had unilaterally decided to wind up the company.

88.     In this correspondence, Mr. Anderson indicated that he intended to take, *inter alia*, the following actions:

> a) Dispose of IDKB Marketing's assets.  Mr. Anderson did not state any details of his plans to dispose of these assets, such as to whom he sold them, for how much, when, or whether the buyers were affiliated with Mr.

Anderson.  Nor did Mr. Anderson indicate any willingness to share this information.

b) Use the proceeds of these sales to retire the Credit Accounts (which Mr. Anderson and his company, IDKB, Inc. had personally guaranteed) in preference to the Note, which obligated IDKB Marketing to repay the Lodoens.

89.    Despite request, Mr. Anderson has provided the Lodoens with no further details regarding the financial status, or disposition of the assets of the IDKB Companies.

90.    On information and belief, Mr. Anderson disposed of the IDKB Companies' assets for his own personal gain.

91.    Mr. Anderson testified at the meeting of the creditors that tens of thousands of dollars' worth of high-end audiovisual equipment and other assets belonging to the IDKB Companies are currently located in his home.

92.    On information and belief, Mr. Anderson sold, assigned, or otherwise transferred the IDKB Companies' assets to another entity which Mr. Anderson is affiliated with for less than fair market value with intent to hinder, delay, or defeat the Lodoens' and the IDKB Companies' ability to recover those assets.

93.    On information and belief, Mr. Anderson usurped the IDKB Companies' business opportunities for himself.

94.    In July 2016, Mr. Lodoen demanded ZWM return the unused portion of the retainer he advanced to facilitate the startup of the IDKB Companies.

95.    Mr. Anderson demanded ZWM pay this money to him, claiming the unused portion of the retainer belonged to IDKB Marketing.

96.    In response to Mr. Anderson's request, on July 21, 2016, ZWM provided the unused portion of Mr. Lodoen's $5,000 retainer—$3,010—to Mr. Anderson.

97.    This money did not belong to Mr. Anderson or IDKB Marketing.

98.     Mr. Anderson converted these funds for his own purposes.

99.     The Andersons have cut off all contact with the Lodoens.

100.    On information and belief, Mr. Anderson, through his new company, now markets the App to the public for a profit.

101.    Beginning on or about September 8, 2016, Mr. Anderson began falsely stating to members of the VWO that Mr. Lodoen stole money from the VWO Charity and VFC Charity, and urged members to expel Mr. Lodoen from the VWO on that basis.

102.    On information and belief, Mr. Anderson seeks Mr. Lodoen's expulsion from the VWO because Mr. Anderson believed his efforts to market the App to VWO membership would be more successful in Mr. Lodoen's absence.

103.    In total, the Lodoens contributed $203,000 to the Andersons, none of which has been returned to them or accounted for.

104.    On September 13, 2016, the Lodoens commenced the Minnesota Action to recover the money wrongfully stolen by the Andersons.

105.    On March, 7, 2017, the Andersons filed a voluntary petition for bankruptcy under Chapter 7 of the United States Bankruptcy Code, and the Minnesota Action was automatically stayed pursuant to 11 U.S.C. § 362 pending the resolution of the Andersons' Chapter 7 case.

## COUNT I—FRAUDULENT MISREPRESENTATION, FALSE PRETENSES, FRAUD

### (Nondischargeability of debt owed to Mr. and Mrs. Lodoen by Mr. and Mrs. Anderson pursuant to 11 U.S.C. § 523(a)(2)(A))

106.    Mr. and Mrs. Lodoen restate and reallege each of the preceding paragraphs, and fully incorporate them herein.

107.    Mr. and Mrs. Anderson represented to the Lodoens that if they invested money to fund the startup and operation of the IDKB Companies, Mr. Anderson would use his best, good-

faith efforts to manage the IDKB Companies to generate profits for their members, and engage in a business relationship with VWO Charity and VFC that would benefit those charitable organizations.

108.    Mr. and Mrs. Anderson represented to the Lodoens that if they loaned additional money to fund the operation of the IDKB Companies, Mr. Anderson would use his best, good-faith efforts to manage the IDKB Companies to generate profits for their members, and engage in a business relationship with VWO Charity and VFC that would benefit those charitable organizations.

109.    The foregoing representations were knowingly false when made and were intended to deceive the Lodoens and cheat them out of their money.

110.    Mr. and Mrs. Anderson always intended to simply use the Lodoens' money to pay Mr. Anderson's salary without reporting that income to the IRS, fund all of the App's considerable startup expenses, test the App's viability in various markets at the Lodoens' expense, and to abscond with the IDKB Companies' tangible and intangible assets once the App was in a position to generate a profit.

111.    Mr. and Mrs. Anderson intended that the Lodoens would rely on these misstatements.

112.    The Lodoens, in fact, relied on these misstatements by supplying hundreds of thousands of dollars to the IDKB Companies.

113.    Mr. and Mrs. Anderson also willfully and maliciously defrauded the Lodoens by attempting to hinder, delay, and/or defeat the Lodoens' ability to recover that money by, among other things, selling, assigning, or otherwise transferring the IDKB Companies' assets to another entity which Mr. Anderson is affiliated with and for less than fair market value.

114.    Under the circumstances, it would be unjust for Mr. and Mrs. Anderson to retain these benefits.

115.    As a direct and proximate result of Mr. and Mrs. Andersons' actions, which constitute wrongful and intentional misrepresentations, false pretenses, fraud, and unjust enrichment, the Lodoens have suffered damages in excess of $50,000, the exact amount to be proven at trial.

116.    In committing the actions hereinabove described, Mr. and Mrs. Anderson acted willfully, maliciously, and with deliberate intent to deceive the Lodoens, and as such, the Lodoens are entitled to punitive and exemplary damages in an amount to be determined at trial.

117.    The foregoing acts are grounds for denying Mr. Anderson a discharge under section 523(a) of the United States Bankruptcy Code, including, specifically, sections 523(a)(2)(A) and (a)(6).

## COUNT II—BREACH OF FIDUCIARY DUTY

### (Nondischargeability of debt owed to Mr. Lodoen by Mr. Anderson pursuant to 11 U.S.C. § 523(a)(4))

118.    Mr. Lodoen restates and realleges each of the preceding paragraphs, and fully incorporates them herein.

119.    The IDKB Companies were at all relevant times closely held.

120.    At all relevant times, Mr. Anderson owed Mr. Lodoen, a 50% owning member of the closely held IDKB Companies, common law fiduciary duties, including duties of loyalty, care, good faith, and fair dealing.

121.    At all relevant times, Mr. Anderson also owed Mr. Lodoen, a 50% owning member of the closely held IDKB Companies, statutory fiduciary duties, including duties of loyalty, care, good faith, and fair dealing.

122.    Mr. Anderson, by his actions, which constituted fraud and intentional and malicious defalcation (i.e., failure to account), breached those duties.

123.    As a direct and proximate cause of Mr. Anderson's breach of these fiduciary duties, Mr. Lodoen has suffered damages in excess of $50,000, the exact amount to be proven at trial.

124.    In committing the actions hereinabove described, Mr. Anderson acted willfully, maliciously, and with deliberate intent to deceive the Mr. Lodoen, and as such, Mr. Lodoen is entitled to punitive and exemplary damages in an amount to be determined at trial.

125.    The foregoing acts are grounds for denying Mr. Anderson a discharge under section 523(a) of the United States Bankruptcy Code, including, specifically, sections 523(a)(4) and (a)(6).

## COUNT III—LARCENY AND EMBEZZLEMENT

### (Nondischargeability of debt owed to Mr. and Mrs. Lodoen by Mr. and Mrs. Anderson pursuant to 11 U.S.C. § 523(a)(4))

126.    Mr. and Mrs. Lodoen restate and reallege each of the preceding paragraphs, and fully incorporate them herein.

127.    Mr. and Mrs. Anderson, acting individually as well as under the guise of the IDKB Companies, obtained for themselves possession, custody, or title to the Lodoens' property by intentionally deceiving the Lodoens with false representations.

128.    Mr. and Mrs. Anderson knew their representations to be false, intending from the outset to defraud the Lodoens.

129.    Mr. and Mrs. Anderson's misrepresentations, in fact, defrauded the Lodoens.

130.    Mr. and Mrs. Anderson swindled the Lodoens, thereby obtaining the Lodoens' property for themselves.

131.    Insofar as Mr. and Mrs. Anderson came into possession of any of the Lodoens' property lawfully, the Andersons' fraudulent misrepresentations and wrongful retainer and absconding with the Lodoens' property constitutes embezzlement.

132.    As a direct and proximate cause of Mr. and Mrs. Anderson's larceny and embezzlement, the Lodoens have suffered damages in excess of $50,000, the exact amount to be proven at trial.

133.    In committing the actions hereinabove described, Mr. and Mrs. Anderson acted willfully, maliciously, and with deliberate intent to deceive the Lodoens, and as such, the Lodoens are entitled to punitive and exemplary damages in an amount to be determined at trial.

134.    The foregoing acts are grounds for denying Mr. Anderson a discharge under section 523(a) of the United States Bankruptcy Code, including, specifically, sections 523(a)(4), and (a)(6).

## COUNT IV—CONVERSION

### (Nondischargeability of debt owed to Mr. and Mrs. Lodoen by Mr. Anderson pursuant to 11 U.S.C. § 523(a)(6))

135.    Mr. and Mrs. Lodoen restate and reallege each of the preceding paragraphs, and fully incorporate them herein.

136.    The Lodoens hold a personal property interest in the unused portion of the retainer ZWM refunded to IDKB Marketing.

137.    Mr. Anderson has intentionally deprived the Lodoens of this property interest without lawful justification.

138.    Mr. Anderson converted the unused portion of the retainer for his own purposes.

139.    As a direct and proximate cause of Mr. Anderson's actions, which constituted conversion, the Lodoens have suffered damages in the amount of $3,010.

140.    In committing the actions hereinabove described, Mr. Anderson acted willfully and maliciously, and as such, the Lodoens are entitled to punitive and exemplary damages in an amount to be determined at trial.

141.    The foregoing acts are grounds for denying Mr. Anderson a discharge under section 523(a) of the United States Bankruptcy Code, including, specifically, section 523 (a)(6).

## COUNT V—DEFAMATION

**(Nondischargeability of debt owed to Mr. Lodoen by Mr. Anderson pursuant to 11 U.S.C. § 523(a)(6))**

142.    Mr. Lodoen restates and realleges each of the preceding paragraphs, and fully incorporates them herein.

143.    Mr. Anderson maliciously made false statements to numerous members of the VWO tending to harm Mr. Lodoen's personal and professional reputation.

144.    Specifically, Mr. Anderson falsely stated to members of the VWO that Mr. Lodoen stole money from the VWO Charity and VFC, each a charitable organization, in order to pay Mr. Lodoen's business debts associated with the IDKB Companies.

145.    As a direct and proximate cause of Mr. Anderson's actions, which constituted defamation, Mr. Lodoen has suffered damages in excess of $50,000, the exact amount to be proven at trial.

146.    In committing the actions hereinabove described, Mr. Anderson acted willfully and maliciously, and as such, the Lodoens are entitled to punitive and exemplary damages in an amount to be determined at trial.

147.    The foregoing acts are grounds for denying Mr. Anderson a discharge under section 523(a) of the United States Bankruptcy Code, including, specifically, section 523 (a)(6).

## COUNT VI—BREACH OF FIDUCIARY DUTY

**(Nondischargeability of debt owed to the IDKB Companies by Mr. Anderson pursuant to 11 U.S.C. § 523(a)(4))**

**(Asserted Derivatively on Behalf of the IDKB Companies Against Mr. Anderson)**

148.    Mr. Lodoen restates and realleges each of the preceding paragraphs, and fully incorporates them herein.

149.    At all relevant times, Mr. Lodoen is and has been a member of IDKB Marketing, IDKB Research, and IDBK Holding, including the period of time in which Mr. Anderson has taken actions to wind up the IDKB Companies by, *inter alia*, liquidating assets and retiring company debts.

150.    At all relevant times, Mr. Anderson owed the IDKB Companies common law fiduciary duties, including duties of loyalty, care, good faith, and fair dealing.

151.    At all relevant times, Mr. Anderson also owed the IDKB Companies statutory fiduciary duties, including duties of loyalty, care, good faith, and fair dealing.

152.    Mr. Anderson, by his actions, which constituted fraud and intentional and malicious defalcation (i.e., failure to account), breached those duties.

153.    As a direct and proximate cause of Mr. Anderson's breach of these fiduciary duties, the IDKB Companies have suffered damages in excess of $50,000, the exact amount to be proven at trial.

154.    In committing the actions hereinabove described, Mr. Anderson acted willfully and maliciously, and as such, the IDKB Companies are entitled to punitive and exemplary damages in an amount to be determined at trial.

155.    The foregoing acts are grounds for denying Mr. Anderson a discharge under section 523(a) of the United States Bankruptcy Code, including, specifically, sections 523(a)(2)(A), (a)(4), and (a)(6).

156.    It would be futile for Mr. Lodoen to demand that the IDKB Companies bring legal action against Mr. Anderson for his breach of these duties.

157.    Mr. Anderson is the managing member of IDKB Marketing, IDKB Research, and IDKB Holding, and holds a 50% membership in each company.   Mr. Anderson cannot reasonably be expected to cause the IDKB Companies to institute legal action against him and, in fact, can be expected to take all necessary action to prevent the IDKB Companies from instituting such legal action.

### COUNT VII—FRAUD, WASTE

**(Nondischargeability of debt owed to the IDKB Companies by Mr. Anderson pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(6))**

**(Asserted Derivatively on Behalf of the IDKB Companies Against Mr. Anderson)**

158.    Mr. Lodoen restates and realleges each of the preceding paragraphs, and fully incorporates them herein.

159.    At all relevant times, Mr. Lodoen is and has been a member of IDKB Marketing, IDKB Research, and IDBK Holding, including the period of time in which Mr. Anderson has taken actions to wind up the IDKB Companies by, *inter alia*, liquidating assets and retiring company debts.

160.    Mr. Anderson willfully and maliciously wasted the IDKB Companies' tangible and intangible assets by transferring them to third-party entities in which Mr. Anderson had a financial or other interest for less than fair market value.

161.    Mr. Anderson also willfully and maliciously defrauded the IDKB Companies by attempting to hinder, delay, and/or defeat the IDKB Companies' ability to recover those assets by, among other things, selling, assigning, or otherwise transferring those assets to the entity Mr. Anderson is affiliated with and for less than fair market value.

162.    Under the circumstances, it would be unjust for Mr. Anderson and/or the entity Mr. Anderson is affiliated with to retain these benefits.

163.    As a direct and proximate cause of Mr. Anderson's actions, which constitute wrongful and intentional fraud, waste, and unjust enrichment, the IDKB Companies have suffered damages in excess of $50,000, the exact amount to be proven at trial.

164.    In committing the actions hereinabove described, Mr. Anderson acted willfully and maliciously, and as such, the IDKB Companies are entitled to punitive and exemplary damages in an amount to be determined at trial.

165.    The foregoing acts are grounds for denying Mr. Anderson a discharge under section 523(a) of the United States Bankruptcy Code, including, specifically, sections 523(a)(2)(A) and (a)(6).

166.    It would be futile for Mr. Lodoen to demand that the IDKB Companies bring legal action against Mr. Anderson for waste.

167.    Mr. Anderson is the managing member of IDKB Marketing, IDKB Research, and IDKB Holding, and holds a 50% membership in each company.    Mr. Anderson cannot reasonably be expected to cause the IDKB Companies to institute legal action against him and, in fact, can be expected to take all necessary action to prevent the IDKB Companies from instituting such legal action.

## COUNT VIII—LARCENY AND EMBEZZLEMENT

### (Nondischargeability of debt owed to the IDKB Companies by Mr. Anderson pursuant to 11 U.S.C. § 523(a)(4))

### (Asserted Derivatively on Behalf of the IDKB Companies Against Mr. Anderson)

168.    Mr. Lodoen restates and realleges each of the preceding paragraphs, and fully incorporates them herein.

169.    At all relevant times, Mr. Lodoen is and has been a member of IDKB Marketing, IDKB Research, and IDBK Holding, including the period of time in which Mr. Anderson has taken actions to wind up the IDKB Companies by, *inter alia*, liquidating assets and retiring company debts.

170.    Mr. Anderson intentionally and without claim of right took, used, transferred, concealed, or retained possession of movable property of the IDKB Companies without their consent and with intent to deprive the IDKB Companies permanently of possession of said property.

171.    Mr. Anderson swindled the IDKB Companies, thereby obtaining their property.

172.    Mr. Anderson, with intent to defraud, diverted the IDKB Companies' property other than in accordance with their general business purposes, or for purposes other than those specified in the IDKB Companies' governing documents.

173.    Insofar as Mr. Anderson came into possession of any of the IDKB Companies' property lawfully, Mr. Andersons' wrongfully retained and absconded with that property, which constituted embezzlement.

174.    As a direct and proximate cause of Mr. Anderson's actions, the IDKB Companies have suffered damages in excess of $50,000, the exact amount to be proven at trial.

175.    In committing the actions hereinabove described, Mr. Anderson acted willfully and maliciously, and as such, the IDKB Companies are entitled to punitive and exemplary damages in an amount to be determined at trial.

176.    The foregoing acts are grounds for denying Mr. Anderson a discharge under section 523(a) of the United States Bankruptcy Code, including, specifically, section 523(a)(4).

177.    It would be futile for Mr. Lodoen to demand that the IDKB Companies bring legal action against Mr. Anderson for larceny and embezzlement.

178.    Mr. Anderson is the managing member of IDKB Marketing, IDKB Research, and IDKB Holding, and holds a 50% membership in each company.  Mr. Anderson cannot reasonably be expected to cause the IDKB Companies to institute legal action against him and, in fact, can be expected to take all necessary action to prevent the IDKB Companies from instituting such legal action.

## PRAYER FOR RELIEF

WHEREFORE, the Lodoens respectfully request that this Court enter judgment in their favor and against the Andersons as follows:

1.    Entering judgment determining that the debts owed by Defendants' to Plaintiffs' as established in Counts I-IX are not dischargeable in Defendants' bankruptcy case;

2.    Awarding Mr. and Mrs. Lodoen, IDKB Marketing, IDKB Research, and IDKB Holding their damages, attorneys' fees, and costs; and

3.    Granting Mr. and Mrs. Lodoen, IDKB Marketing, IDKB Research, and IDKB Holding such other and further relief as the Court deems just and equitable.

Dated:  June 12, 2017              **WINTHROP & WEINSTINE, P.A.**


By: /s/ Reid J. Golden
       Reid J. Golden (admitted *pro hac vice*)
       225 South Sixth Street, Suite 3500
       Minneapolis, Minnesota 55402

Tel:  (612) 604-6400
Fax: (612) 604-6800
Email:  rgolden@winthrop.com

and

**LATHAM, SHUKER, EDEN & BEAUDINE, LLP**

By: /s/ Justin M. Luna
        Justin M. Luna, Esq.
        Florida Bar No. 0037131
        111 N. Magnolia Ave., Suite 1400
        Orlando, Florida, 32802-3353
        Tel:  (407) 481-5800
        Fax: (407) 481-5801
        Email:  jluna@lseblaw.com

*Attorneys for Plaintiffs Garry P. Lodoen and Darla K. Lodoen*

13513850v4